Jean A. KILBY, on her own behalf and
on behalf of Jane L. Kilby,
Appellant,

v.

Marion D. FOLSOM, Secretary of Health,
Education and Welfare of the
United States.

No. 11990.

United States Court of Appeals
Third Circuit.

Argued Nov. 13, 1956.

Decided Dec. 4, 1956.

Cuthbert H. Latta, Philadelphia, Pa. (J. Peter Williams, F. Hastings Griffin, Jr., Philadelphia, Pa., on the brief), for appellant.

Alan J. Swotes, Asst. U. S. Atty., Philadelphia, Pa. (W. Wilson White, U. S. Atty., Philadelphia, Pa., on the brief), for appellee.

Before GOODRICH, McLAUGHLIN and STALEY, Circuit Judges.

GOODRICH, Circuit Judge.

The plaintiff in this appeal is seeking recovery of Social Security benefits. The case hinges upon the question whether plaintiff's foster daughter, Jane, is the "child" of plaintiff's deceased husband Ralph M. Kilby, within the meaning of that word as used in the Social Security Act.[1] Jane qualifies as a "child" of Ralph M. Kilby only if she would be entitled to a child's share in his intestate estate under the laws of Pennsylvania which was the decedent's domicile at his death.[2] Plaintiff lost before the referee and before the District Court for the Eastern District of Pennsylvania.

██ The evidentiary facts are not in dispute. The question concerns the conclusion to be drawn from the facts. Since the problem deals with the ultimate conclusion and not evidence, the usual rules about conclusiveness of findings by the triers of fact do not apply. Curtis Co. v. Commissioner, 3 Cir., 1956, 232 F.2d 167; Lehmann v. Acheson, 3

Cir., 1953, 206 F.2d 592. Nor is there any question of particular administrative competence involved, for the problem is a legal one. The case was treated as one not involving a disputed set of facts in the district court. There the defendant was given summary judgment.

Ralph M. Kilby and his wife, Jean Kilby, very much desired a child but had not had one of their own. They had opportunity through a physician friend in Cincinnati to adopt a newborn baby. The mother of the child turned the infant over to Mrs. Kilby. Adoption proceedings were never completed prior to Mr. Kilby's death.

██ Our question is, therefore, whether the parties concerned did such things in the lifetime of Mr. Kilby as entitle the child to claim an intestate share in his estate. There is no common law adoption in Pennsylvania, In re Carroll's Estate, 1908, 219 Pa. 440, 68 A. 1038, and formal adoption in the manner prescribed by statute, when it occurs, now "severs [the child] entirely from its own family tree and engrafts it upon that of its new parentage * * *."[3] Harvey Adoption Case, 1953, 375 Pa. 1, 4, 99 A.2d 276, 277, 278. But this the foster parents never did.

They did do many other things, however, consistent only with a showing of their intention to create the equivalent of parent-child relationship between themselves and the little girl who was given into their custody. The mother of this baby signed a paper at the time Mrs. Kilby got the child. By this paper the mother stated that the child had been given by her to Mr. and Mrs. Kilby "to be adopted by them as soon as is le-

1. Survivors benefits are sought under 49 Stat. 622 et seq. (1935), as amended, 64 Stat. 482 et seq. (1950), as amended, 42 U.S.C.A. § 402 et seq.

Plaintiff seeks mother's benefits for herself. To do so she must establish that Jane was a "child" of Ralph, section 202(g) (1) (E), 42 U.S.C.A. § 402 (g) (1) (E). Plaintiff also sues on behalf of Jane and seeks child's benefits under section 202(d), 42 U.S.C.A. § 402(d).

2. Section 216(h) (1), 42 U.S.C.A. § 416 (h) (1).

3. "For purposes of descent by, from and through an adopted person he shall be considered the issue of his adopting parent or parents and not the issue of his natural parents * * *." Pa.Stat.Ann. tit. 20, § 1.8 (Purdon 1950) (Pa. Intestate Act of 1947, § 8).

gally permitted" and relinquished all claims she had to the child. The Kilbys immediately assumed responsibility for the little girl. They sent out announcements of her birth as if born to them; Mr. Kilby made Jane a contingent beneficiary of his life insurance policies which ran to Mrs. Kilby as beneficiary. He claimed her as a dependent "daughter" in his income tax return. The Kilbys gave the child their own name and in all respects treated her as their own.

■ Now what is the effect of all this? The rule concerning the subsequent action of parties as a criterion of interpretation for their agreement is thus stated in the Restatement, Contracts, § 235(e) (1932):

"(e) If the conduct of the parties subsequent to a manifestation of intention indicates that all the parties placed a particular interpretation upon it, that meaning is adopted if a reasonable person could attach it to the manifestation."

The same proposition with a citation of decisions is found in 3 Williston, Contracts § 623 (rev. ed. 1936). Subsequent conduct is relevant in determining whether a foster parent has bound himself to give a child inheritance rights. Evans's Estate, 1911, 47 Pa.Super. 196. The defendant secretary argues, and rightly of course, that to have a contract there must be a contract with somebody. But he argues incorrectly, we think, that there was not a contract with somebody here. The baby's natural mother offered her to the Kilbys "to be adopted by them." They took the child. There seems no difficulty in finding a consensual transaction between the natural mother and the foster parents. But so far we stick in the bark. What did the mother mean by the phrase "to be adopted" and what did the Kilbys mean by it?

■ If this word "adopt" was used in a document drawn up by one lawyer to be checked by another lawyer we would naturally give it its technical meaning. See Restatement, Contracts, § 235 (1932). But this paper given to Mrs. Kilby is quite evidently a homemade affair given by a layman to a layman. What does "adopt" mean? The dictionary gives six meanings for it and gives as synonyms "receive, accept, choose, take up; naturalize, father, mother; welcome, attach oneself to." And the first meaning given is:

"to take by choice into a relationship, as child, heir, friend, citizen, etc.; esp., to take voluntarily (a child of other parents) to be in place of, or as, one's own child."[4]

We have no reason for thinking that this natural mother in her homemade document was using "adopt" as a word of technical legal art. We think the fair interpretation to be given it was that she was giving up her child to the Kilbys to make it their own. There is no doubt that the Kilbys, throughout the rest of Mr. Kilby's life, certainly treated the child as fully their own as any child could be treated. We think the fair interpretation of what was said and what was done is that the foster parents agreed to and did treat this little girl as their own, fully as much as if she had been their natural, legitimate child. And being treated as a natural, legitimate child necessarily involves the privilege of sharing in the estate of the parent, unless, of course, the parent by will disinherits the child.

This conclusion was the one reached by the Supreme Court of Pennsylvania in In re McDaniel's Estate, 1931, 305 Pa. 17, 156 A. 338. In that case there was formal contract made between the foster parents and Children's Home Society.[5] A closer case to this one is In re Estate

4. Webster's New International Dictionary (2d ed., unabridged 1941). I A New English Dictionary (Oxford, Murray— edit. 1888) gives as the second definition of adopt: "To take as one's own child, conferring all the rights and privileges of childship, or such of them as the law permits to be thus conferred."

5. The contract provided in part: "It is also agreed that said second par-

of Susman, 1897, decided by the Orphans' Court of Allegheny County and reported in 28 Pittsburgh Legal J., N.S., 101. In that case there was no effective adoption. The persons to whom an infant was turned over agreed "to provide for her as our own child." And the child's rights were protected accordingly upon intestacy of the foster parent. Other Pennsylvania cases have been considered but we do not find them to be helpful in the specific problem we have here.[6]

In our opinion the facts before us spell out an agreement by the Kilbys to treat the little girl as their own natural child.

■ Even so, however, the secretary properly points out that in the words of the statute the administrator is to apply "such law as would be applied in determining the devolution of intestate personal property by the courts of the State in which such insured individual * * * was domiciled at the time of his death * * *."[7] Then it is suggested that the rights of one who has a contract to be treated as a natural child are not the same as the natural child's right upon the death of a parent intestate. The rights of one come from a contract; the other by operation of law. But here, too, "devolution" is not a word of art unless a legislature has made it so. The dictionary speaks of "devolution" as the "transference from one person to another; a passing or devolving upon a successor." Webster's New International Dictionary (2d ed., unabridged 1941). The meaning is not limited to intestate succession and we do not see that it needs to be in this case. If this child, as we have worked out above, is entitled to rights in the decedent foster father's estate, we do

not think it matters for her standing in this case whether those rights are worked out on the theory of a contractual right or a share in distribution.

The judgment of the district court will be reversed and the case remanded with directions to enter judgment for the plaintiff.

ties or either of them shall, if they desire so to do, adopt said child * * *.

"And it is agreed, that in case of failure to adopt such child * * * [she] shall be entitled to such interest in their estate, real and personal as though she were their own natural child * * *." 305 Pa. at page 19, 156 A. at page 339.

6. In re Davies' Estate, 1927, 289 Pa. 579, 137 A. 728; Benson v. Nicholas, 1914, 246 Pa. 229, 92 A. 139; In re Carroll's Estate, 1908, 219 Pa. 440, 68 A. 1038; In re Wallace's Estate, 1907, 218 Pa. 39, 66 A. 1098.

7. Section 216(h) (1), 42 U.S.C.A. § 416 (h) (1).